UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES HENRY BARNES,

          Plaintiff,                  Civil Action No. 12-15256

       v.                       District Judge Bernard A. Friedman
                                Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.
_____/

## REPORT AND RECOMMENDATION TO
## GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [10] AND
## DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [12]

Plaintiff James Henry Barnes appeals Defendant Commissioner of Social Security's denial of his application for disability insurance benefits and supplemental security income. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 10, 12). For the reasons set forth below, this Court finds that the Administrative Law Judge erred in failing to rely on the opinion of a medical expert on the issue of equivalence and in assigning limited weight to the opinion of a physician assistant who treated Barnes. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 10) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 12) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED to properly address the medical equivalence issue and to properly evaluate the opinion of the physician assistant.

# I. BACKGROUND

Barnes was 41 years old in June 2006, when he alleges he became disabled. (*See* Tr. 153.) He completed ninth grade and has a GED. (Tr. 51.) Barnes previously worked as a restaurant dishwasher and a general laborer in manufacturing. (Tr. 195.) He alleges disability on the basis of back and shoulder problems, mental disorder, and emotional disorder. (*See* Tr. 54–55, 234.)

## A. Procedural History

On February 16, 2010, Plaintiff protectively applied for disability insurance benefits and supplemental security income asserting that he became unable to work on June 1, 2006. (Tr. 71, 153.) The Commissioner initially denied Plaintiff's disability application on June 18, 2010. (Tr. 71.) Plaintiff then requested an administrative hearing, and on April 27, 2011, he appeared with counsel before Administrative Law Judge B. Lloyd Blair, who considered his case *de novo*. (Tr. 46–69.) In a May 23, 2011 decision, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (*See* Tr. 41.) The ALJ's decision became the final decision of the Commissioner on October 17, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 11.) Plaintiff filed this suit on November 29, 2012. (Dkt. 1, Compl.)

## B. Medical Evidence

### 1. Mental Impairments

Michigan's Disability Determination Services ("DDS"), a state agency that helps the Social Security Administration evaluate disability claimants in Michigan, referred Barnes to Michael Matouk, M.A., a limited license psychologist. (Tr. 294.) Matouk examined Barnes on April 29, 2010. (*Id.*) Matouk's psychological evaluation of Barnes was co-signed by Terence

Campbell, Ph.D., a fully licensed psychologist. (Tr. 298.) Matouk diagnosed generalized anxiety disorder, depressive disorder not otherwise specified, and personality disorder not otherwise specified—anti-social, dependent features. (*Id.*) Matouk gave Barnes a Global Assessment of Functioning ("GAF") score of 50. (*Id.*)[1] His prognosis was "Fair to Poor—treatment dependent." (*Id.*)

Matouk concluded that Barnes "exhibit[ed] an estimated Low-Average intellectual functioning as informally assessed," with concentration and memory functioning that was "fair, and essentially congruent with his abilities." (Tr. 297.) According to Matouk, Barnes "appears keenly aware of his limitations, and has consequently resorted to what has become a history of poor judgment and decision-making based upon fear responses." (*Id.*) Matouk noted that "[p]ersonality features may inhibit him from seeking treatment." (*Id.*) Matouk opined that Barnes "appear[ed] functional for labor-related jobs within his range of aptitude," although "his poor judgment and irritated affect would likely interfere with task persistence" and "[h]e would function more effectively with psychological, vocational, and psychiatric intervention." (*Id.*) Matouk also indicated that Barnes "appear[ed] incompetent to manage his benefits." (*Id.*)

DDS consulting psychologist Ken Lovko, Ph.D., completed a Psychiatric Review

---

[1] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"),* 30–34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32. A GAF score of 41 to 50 reflects "[s]erious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *DSM–IV* at 34.

Technique form on June 17, 2010, based on his review of Barnes's records. (Tr. 299–312.) Dr. Lovko compared the evidence of Barnes's functional limitations to the criteria for the Social Security Agency's Listed Impairments 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.08 (personality disorders). (Tr. 309.) *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listing of Impairments"). He concluded that Barnes had a moderate degree of limitation in the three functional areas of the Agency's "B" criteria for mental disorders—restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace—and had no extended episodes of decompensation. (Tr. 309.) He also concluded that the evidence did not establish the presence of the "C" criteria for mental disorders. (Tr. 310.) Dr. Lovko noted that the records did not reflect any past or present psychiatric treatment. (*See* Tr. 311.) Dr. Lovko stated: "Dr. Matouk's opinion is given considerable weight regarding the assessment of the clai[ma]nt's residual functional capacity," noting that "Dr. Matouk is a licensed psychologist and has much expertise in conducting mental status evaluations for Social Security Disability." (Tr. 311.)

Dr. Lovko also completed a Mental RFC form, in which he concluded:

> While C[laiman]t's symptoms may present some impediment to work situations with large numbers of people, it does seem that the c[laiman]t could deal with environments that have fewer persons in them, and where stress is limited.
>
> The evidence suggests that claimant can understand, remember, and carry out simple tasks without special considerations in many work environments. The claimant can relate on at least a superficial basis on an ongoing basis with co-workers and supervisors. The claimant can attend to task for sufficient periods of time to complete tasks. The claimant can manage the stresses

4

involved with simple work.

(Tr. 315.) Dr. Lovko based this RFC partly on the lack of evidence of psychiatric treatment, psychotherapy services, psychotropic medications, hospitalizations, and periods of decompensation in Barnes's records. (*Id.*) The psychologist noted that while Barnes's mental impairments "might interfere with his ability to seek t[reatment], [the medical evidence] indicates he has been willing to seek treatment for physical issues and so it is not unreasonable that he could for psych issues if they were severely problematic." (*Id.*) In addition, "C[laimant] has a long work history and at least one of his diagnoses, personality disorder, would reasonably have been present during the times when he was able to sustain employment previously." (*Id.*)

### 2. Physical Impairments

Barnes was treated on November 4, 2010, by Theodore Densley, M.D., at CBM Medical, for pain in his right hip and lower back. (Tr. 338, 343.) Dr. Densley prescribed Motrin and referred Barnes for x-rays, which were taken a week later. The x-ray of Barnes's lumbar spine showed bilateral lower lumbar facet disease at L4-L5 and S-1. (Tr. 339.) Disc spacing was good, and the upper facets and sacroiliac joints were normal. (*Id.*) The x-ray of Barnes's right hip was normal. (Tr. 340.)

Barnes returned to CBM for treatment of his lumbar pain on approximately a monthly basis from November 22, 2010, to April 15, 2011. (Tr. 338, 357–364.) He was seen on each occasion by certified physician assistant Melissa Bogos, who prescribed Motrin and Vicodin. (*Id.*)

Dr. Densley referred Barnes for a CT scan of his lumbar spine, which was taken on

January 27, 2011. (Tr. 365.) It showed evidence of degenerative disc disease at L4-L5 and L5-S1, slight anterior spondylolisthesis of L4 on L5, diffuse central bulging of the annulus fibrosis at L4-L5, associated marked spinal canal stenosis at L4-L5, questionable focal centrally herniated nucleus pulposus at L5-S1, and bilateral facet arthritic changes at L4-L5 and L5-S1, according to the radiologist. (*Id.*)

PA Bogos completed a "Physical Residual Functional Capacity Questionnaire" on April 20, 2011. (Tr. 367–70.) She wrote that she treated Barnes on a monthly basis. (Tr. 367.) Her diagnosis was lumbar "DDD" or degenerative disc disease, manifested by lumbar pain and tingling in the left leg. (*Id.*) She indicated that his condition was deteriorating, and has lasted or could be expected to last at least 12 months. (*Id.*) According to PA Bogos, Barnes's pain was severe enough to "constantly" interfere with the attention and concentration needed to perform simple work tasks, he was incapable of even low stress jobs, and he would likely be absent from work more than four days per month as a result of his impairments. (Tr. 368, 370.) She indicated that he could stand or walk less than two hours and sit less than two hours in an eight-hour working day with normal breaks, and he would need a job that permitted shifting positions at will and unscheduled breaks with periods of walking approximately every hour. (Tr. 369.) She indicated that he could not walk more than one block without rest or severe pain, but that he did not need a cane or other assistive device for occasional standing or walking. (Tr. 368–69.) PA Bogos said Barnes could lift and carry up to ten pounds "rarely" but never twenty pounds; occasionally look down, turn his head right or left, look up, or hold his head in a static position; and rarely twist, stoop, crouch or squat, or climb ladders or stairs. (Tr. 369–70.) She said he had

no significant limitations with reaching, handling, or fingering. (Tr. 370.)

### C. Testimony at the Hearing Before the ALJ

#### 1. Plaintiff's Testimony

At the hearing before the ALJ, Barnes testified that he was "do[ing] minimal work" as "the care giver for [his] sister," which entailed "just cook[ing] and wash[ing] dishes," and was limited to about six hours per week. (Tr. 51, 61.) But he said the work had "become stressful" and he was ready to give it up. (Tr. 62.)

Barnes said he previously worked as a general laborer for various manufacturers. (*See* Tr. 52–53.) He said those jobs required lifting "no more than 15, 20 pounds." (Tr. 53.)

When the ALJ asked Barnes what conditions were preventing him from working, Barnes said that his lower back was "deteriorating," that he was "having a hard time adjusting, . . . just getting out the bed sometimes," that he had "problems" with his right shoulder, and that he "w[o]ke up in a lot of hot sweats," and "barely g[o]t enough sleep." (Tr. 54–55.)

In response to the ALJ's questions, Barnes testified that he had not had any physical therapy, shots, or surgery for his back, although PA Bogos had recommended surgery. (*See* Tr. 55.) He said he was taking Vicodin and Motrin to treat the pain. (Tr. 57.) Barnes said his back pain "comes and goes," and that he was in pain during the hearing—about a five or six out of ten—despite medication. (*See* Tr. 56.) He experienced tingling in his hamstrings in the morning, and weakness in his legs, especially when it was cold or raining. (Tr. 56, 62.) Barnes also said that he limped. (Tr. 61–62.)

Barnes also testified that he had not had any physical therapy, shots, or surgery for his

7

shoulder, and surgery has not been recommended. (Tr. 57.)

When questioned about his activities, Barnes said he did not do laundry, shop for groceries, or do yard or gardening work. (Tr. 59.) He did cook and wash dishes. (Tr. 60.) He said he "watch[ed] a lot of TV," and "spen[t] most of [his] day in the bed." (Tr. 59–60.) He napped two or three times a day for half an hour to an hour. (Tr. 60, 62.) He also said he had to lay down with his legs up to relieve pain, two to three times a day for an hour or two. (Tr. 63.) "Every once in a while" he visited his mother. (Tr. 60.)

Barnes said he experienced pain when climbing stairs and bending over. (Tr. 60.) Squatting relieved the pain in his back, so he did it often. (Tr. 60.) He said he probably could not pick up more than 10 or 15 pounds, could not stand more than 5 or 10 minutes before needing to sit, could not sit more than 15 or 20 minutes before needing to get up, and could not walk more than one block. (Tr. 61.) When caring for his sister, he said he had to take a break and rest because of difficulty breathing after about 15 minutes to half an hour of moving around to fix and serve a meal. (Tr. 65.)

Barnes testified that he was experiencing depression, difficulty concentrating, and frustration, and attributed it to not being able to move around like he used to because of the pain in his lower back and hip. (*See* Tr. 62–64.) He also said he could not be around people "too often" because he would "rather be alone." (Tr. 64.) And he had experienced some problems with memory. (*See* Tr. 64.)

### 2. Vocational Expert's Testimony

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs

would be available for someone with functional limitations approximating Plaintiff's. The ALJ

asked about job availability for a hypothetical individual of Plaintiff's age, education, and work

experience who

> can meet demands of light work; should never use ladders,
> scaffolds, or ropes; should only occasionally use ramps, stairs,
> stoop, kneel, crouch, or crawl; should avoid concentrated exposure
> to extreme cold and wetness; only occasionally bend, twist, turn at
> the waist; should have only simple unskilled work with an SVP of
> 1 or 2; work involving just one, two, or three-step instructions; no
> jobs involving concentration and detail or precision task,
> multitasking, reading, computing, calculating, or problem solving
> . . . should have work requiring just brief or superficial contact
> with the general public. And no jobs that have quotas mandating a
> specific number of pieces per hour or having a down-line or up-
> line coworker depending on [INAUDIBLE] productivity.

(Tr. 66–67.) The VE testified that such an individual could not perform the claimant's past

relevant work, which she classified as light, unskilled work. (Tr. 66–67.) But she said there

would be a significant number of jobs in the regional or national economy that the hypothetical

individual could perform, including dishwasher (4,000 jobs in the lower peninsula of Michigan),

light janitorial (1,900 ), and packer (2,300).

The VE also testified that if the ALJ found the claimant's testimony "truthful in all

respects relative to pain, discomfort, and limitations," there would not be any jobs he could

perform. (Tr. 68.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security

income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d

727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14

10

F.3d 1107, 1110 (6th Cir. 1994).

ALJ Blair first found, with respect to Barnes's claim for disability insurance benefits, that Barnes was insured through June 30, 2011. (Tr. 30.) The ALJ then turned to the five-step sequential evaluation of Barnes's allegation of disability. At step one, ALJ Blair found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of June 1, 2006. (Tr. 32.) At step two, he found that Plaintiff had the following severe impairments: adjustment disorder with depressed mood, mild mental retardation, and antisocial personality. (Tr. 32–34.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 34–36.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the exception that: He should never use ladders, scaffolds, or ropes, but can occasionally use ramps, stairs, stoop, kneel, crouch, or crawl. He should avoid concentrated exposure to extreme heat, extreme cold, and wetness. The claimant is limited to only occasional bending, twisting, and turning at the waist. He is further limited to simple unskilled work with a specific vocational preparation (SVP) rating of one or two, which involves one, two, or three step instructions. He is limited to jobs that do not involve concentration on detailed or precision tasks or multi-tasking, reading, computing/calculating, or problem solving, and that requires brief and superficial contact with the general public. The claimant is further restricted to jobs that have no production quotas mandating a specific number of pieces per hour, or with an up line or down line coworker depending on the claimant's productivity.

(Tr. 36.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 40.) At step five the ALJ found, based on vocational expert testimony, that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and

11

residual functional capacity. (Tr. 40–41.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision. (Tr. 41.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court

12

is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512–13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

### A. Steps Two and Three

Plaintiff argues that the ALJ erred by failing to find that Plaintiff's degenerative disc disease was severe. (Pl.'s Mot. Summ. J. at 8–10.) He argues that the error was not harmless because the ALJ failed to consider the impairment at step three, although "the evidence put forth by Plaintiff reasonably could be construed to meet Listing 1.04A." (Pl.'s Mot. Summ. J. at 10.) Plaintiff also argues that the ALJ erred by failing to obtain an expert medical opinion regarding medical equivalency as required by SSR 96-6p because "the only signature on the Disability Determination Transmittal is from Dr. Lovko, a mental health specialist," and "the Commissioner cannot rely upon a mental health specialist to reach a conclusion concerning medical equivalency under Listing 1.04A." (*Id.* at 10–11.)

The Commissioner argues that the ALJ was not required to analyze Plaintiff's back

impairment at step three after finding it was not severe, citing *Smith-Johnson v. Commissioner of Social Security*, No. 11-14765, 2012 WL 7784979, at *6 (E.D. Mich. Dec. 14, 2012). (Def.'s Mot. Summ. J. at 4–5.) The Commissioner also argues that the ALJ "was not required to seek an opinion from a medical expert because the evidence was sufficient to make a disability determination." (*Id.* at 5.) In addition, the Commissioner pointed out that Plaintiff did not identify a back impairment as a basis of disability on his disability report forms. (*Id.* at 5–6 (citing Tr. 220, 234).)

It is well established in Sixth Circuit precedent that failure to find an impairment severe at step two is not reversible error if the ALJ found another impairment severe and therefore continued with the five-step evaluation. *See, e.g.*, *Fisk v. Astrue*, 253 F. App'x 580, 584 (6th Cir. 2007); *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008). The purpose of step two is "to screen out totally groundless claims." *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009). If the ALJ continued with the remaining steps, any error at step two was harmless. But if the ALJ erroneously found that an impairment was not severe and therefore failed to consider that impairment at step three, there may be grounds for reversal. The relevant consideration, however, is whether the ALJ erred at step three by failing to consider the impairment, not whether the ALJ erred at step two by finding it non-severe.

ALJ Blair did not provide any discussion at step three about whether Barnes's physical impairments met or medically equaled a listed impairment. His decision addresses only whether Barnes's mental impairments met or medically equaled the criteria of listings 12.04 (affective disorders) and 12.05 (mental retardation). (*See* Tr. 34–36.)

14

At step three, the ALJ "must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 (6th Cir. 2011). In *Reynolds*, the Sixth Circuit found that the ALJ erred because "[n]o analysis whatsoever was done as to whether Reynolds' physical impairments (all summed up in his finding of a severe "back pain" impairment) met or equaled a Listing under section 1.00, despite his introduction concluding that they did not." *Id.* The ALJ "needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Id.* at 416.

But failure to provide this explanation at step three is grounds for remand only if it is not harmless; the *Reynolds* court concluded that "correction of such an error is not merely a formalistic matter of procedure, for it is possible that the evidence Reynolds put forth could meet this listing." *Id.* at 415. An ALJ's finding that no listing was met or equaled may be found harmless if "concrete factual and medical evidence" is "apparent in the record" such that a court can discern how the ALJ "would have" reasoned. *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 656–57 (6th Cir. 2009) (discussing harmless error review); *M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 860 (E.D. Mich. 2012) (applying *Rabbers* to error at step three).

Thus in *Smith-Johnson v. Commissioner of Social Security*, the case cited by the Commissioner, Executive Magistrate Judge R. Steven Whalen recommended affirming an ALJ's decision although the ALJ failed to expressly consider at step three whether the listing for mental

15

retardation was met, where the ALJ had found at step two that claimant's alleged mental retardation was not a severe impairment and the evidence supported that finding. *See* 2012 WL 7784979, at *6, *recommendation adopted*, 2013 WL 1187031 (E.D. Mich. Mar. 21, 2013). Magistrate Judge Whalen found that the evidence "cannot be reasonably interpreted to conclude that Plaintiff was mentally retarded, much less that the condition was disabling." *Id.* The ALJ's failure to explain his step three finding was therefore harmless.

In determining whether the ALJ's failure to explain his conclusion at step three was harmless, the Court must exercise caution. The Court may not find the ALJ's procedural error harmless merely because substantial evidence exists in the record that could uphold the ALJ's decision. *See M.G.*, 861 F. Supp. 2d at 860. In *Rabbers v. Commissioner of Social Security*, the Sixth Circuit warned that it may be difficult or impossible to determine whether an error is harmless when the record contains "conflicting or inconclusive evidence" not resolved by the ALJ or "evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider." 582 F.3d at 657–68. The Court cannot speculate as to how the ALJ might have weighed such evidence. *See M.G.*, 861 F. Supp. 2d at 860–61.

Barnes argues that his evidence of back issues "reasonably could be construed to meet Listing 1.04A." (Pl.'s Mot. Summ. J. at 10.) Listing 1.04 is for "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Part 404, Subpart P, Appendix 1, at § 1.04. There are three alternative methods of meeting the listing, one of which is outlined in § 1.04(A):

16

"Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *Id.* Comparing these criteria to the available medical evidence, the Court finds that Barnes could not have met the requirements of Listing 1.04(A).

Barnes's x-ray and CT scan show degenerative disc disease and spinal canal stenosis, but there is no mention of nerve root compression in the radiologist's reports. (*See* Tr. 339, 365.) In PA Bogos's questionnaire responses, her diagnosis was limited to degenerative disc disease; again, no mention of nerve root compression. (Tr. 367.) Moreover, there are no objective test results or examination findings in the record that could establish limitation of motion of the spine, motor loss, or sensory or reflex loss. In particular, there is no documentation of positive straight-leg raising tests. The guidance accompanying the Listings provides:

> Examination of the spine should include a detailed description of gait, range of motion of the spine given quantitatively in degrees from the vertical position (zero degrees) or, for straight-leg raising from the sitting and supine position (zero degrees), any other appropriate tension signs, motor and sensory abnormalities, muscle spasm, when present, and deep tendon reflexes. Observations of the individual during the examination should be reported; e.g., how he or she gets on and off the examination table. Inability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss. However, a report of atrophy is not acceptable as evidence of significant motor loss without circumferential measurements of both thighs and lower legs, or both upper and lower arms, as appropriate, at a stated point above and below the knee or elbow given in inches or centimeters. Additionally, a

17

> report of atrophy should be accompanied by measurement of the
> strength of the muscle(s) in question generally based on a grading
> system of 0 to 5, with 0 being complete loss of strength and 5
> being maximum strength. A specific description of atrophy of hand
> muscles is acceptable without measurements of atrophy but should
> include measurements of grip and pinch strength.

20 C.F.R. Part 404, Subpart P, Appendix 1, at § 1.00(E). The handful of examination notes in the

record do not contain any of these detailed findings. The record simply lacks evidence that could

support a finding that Barnes met the listing.

The Court, however, is troubled by the lack of evidence regarding Barnes's back issues.

In particular, the lack of any consultative examination or even a record review by a consulting

physician to evaluate Barnes's physical impairments is troubling. Defendant points out that

Barnes did not initially allege physical impairments in his application for disability benefits.

When asked, in an undated "Disability Report" form, to list all physical and mental conditions

that limit his ability to work, he wrote: "mental disorder" and "emotional disorder." (Tr. 234.)

His answers on a "Function Report" form dated March 15, 2010, focus on depression, "nerves,"

and sleep problems. (Tr. 245–52.) But he did mention "lifting/back problem" on the latter form

(Tr. 250), and in February 2011—prior to the April 2011 hearing before the ALJ—he submitted

a "Recent Medical Treatment" form reporting that PA Bogos told him he "may need surgery in

the future but [his] back won't be the same" (Tr. 230). At the hearing, Barnes focused almost

exclusively on his back problems, even seeming to attribute his depression to his physical

impairments. (*See* Tr. 63–64.)

The only opinion in the record regarding the effect of Barnes's physical

18

impairments—from PA Bogos—provided that Barnes was incapable of even low stress jobs, and he would likely be absent from work more than four days per month as a result of his impairments. (Tr. 368, 370.) Thus, Plaintiff's allegations of a back impairment are not "totally groundless"; the only available evidence clearly indicates that the impairment has "more than a minimal effect" on Barnes's ability to do basic work activities. *Cf. Nejat*, 359 F. App'x at 576 (finding harmless ALJ's step two finding that impairments were not severe). Of course, the ALJ assigned "limited weight" to PA Bogos's opinion (Tr. 39). But as discussed below, the ALJ's decision to give PA Bogos's opinion limited weight is not supported by substantial evidence. Most significantly, there is no other opinion on Barnes's physical impairments on which the ALJ could rely to cast doubt on Bogos's opinion.

Despite PA Bogos's uncontradicted opinion that Barnes's physical impairments cause significant functional limitations, the record lacks a medical expert opinion on whether Plaintiff's physical impairments equaled any of the Listed Impairments. As Plaintiff points out, Social Security Ruling ("SSR") 96-6p requires that the "judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."[2] SSR 96-6p, 1996 WL 374180 at *3 (1996); *see also* 20 C.F.R. § 416.926(c) ("We also consider the opinion given by one or more medical or psychological consultants designated by the Commissioner."); *Retka v. Comm'r of*

---

[2] Social Security Rulings are "binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1); *Heckler v. Edwards*, 465 US 870, 873 n.3 (1984).

*Soc. Sec.*, 70 F.3d 1272 (6th Cir. 1995) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made."); *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *4 (E.D. Mich. Sep. 25, 2013) (remanding because there was no expert medical opinion on the issue of equivalence, collecting cases); *Manson v. Comm'r of Soc. Sec.*, No. 12-11473, 2013 WL 3456960, at *11 (E.D. Mich. July 9, 2013)  (remanding for an expert opinion at step three).

A "Disability Determination and Transmittal" form signed by a medical or psychological consultant, a "Psychiatric Review Technique" form, or "various other documents on which medical and psychological consultants may record their findings," can fulfill this requirement to "ensure that this opinion has been obtained at the first two levels of administrative review." *See* SSR 96-6p, 1996 WL 374180 at *3. Here, the Disability Determination and Transmittal form refers to Dr. Lovko's Psychiatric Review Technique for the "Physician or Medical Specialist Signature." (Tr. 71.) Dr. Lovko's specialty was psychology. (*See* Tr. 299; Program Operations Manual System § DI 26510.090(D), *available at* http://policy.ssa.gov/poms.nsf/lnx/0426510090 (last updated Aug. 29, 2012).) His Psychiatric Review Technique, as well as the Mental RFC form he completed, expressly addressed only listings for mental impairments: 12.04 (affective disorders), 12.06 (anxiety-related disorders), 12.08 (personality disorders), and 12.09 (substance addiction disorders). (Tr. 309, 313.)

Dr. Lovko's opinions cannot support a conclusion that Barnes's physical impairments were not equivalent to Listing 1.04. *See Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001) (finding that a psychologist was not qualified to diagnose a claimant's underlying physical

20

conditions); *cf. Byerley v. Colvin*, No. 12-CV-91, 2013 WL 2145596, at *11 (N.D. Ind. May 14, 2013) ("Because the psychologist who prepared the form did not consider physical impairments, it cannot be relied on as expert opinion that Plaintiff's combination of physical and mental impairments do not equal a Listing."); *Watson v. Massanari*, No. 00-3621, 2001 WL 1160036, at *14 (E.D. Pa. Sept. 6, 2001) (remanding "so that the ALJ can enlist the services of a medical expert capable of making an equivalency finding as to Plaintiff's impairments *in combination*," where the expert opinions on equivalence in the record expressly addressed only the claimant's physical impairments).

This is not a case in which the ALJ's failure to consult an expert regarding equivalence can be found harmless. The available medical evidence is insufficient to support the ALJ's conclusion that Barnes's physical impairments are not medically equivalent to a listed impairment. *See Barnett v. Barnhart*, 381 F.3d 664, 671 (7th Cir. 2004) ("[T]he ALJ simply assumed the absence of equivalency without any relevant discussion. That assumption cannot substitute for evidence and does not support the decision to deny benefits."). The ALJ's improper evaluation of PA Bogos's opinion, as discussed below, and the lack of other evidence regarding Barnes's physical impairments are integral to the Court's finding. The Court recommends remand so that a medical expert can be consulted regarding Barnes's physical impairments.

### B. Evaluation of Dr. Campbell's Opinion

Plaintiff argues that the ALJ erred by assigning "considerable weight" to Dr. Campbell's opinion without "provid[ing] a detailed explanation outlining the reasons for that weight," and

by cherry-picking the portions of the opinion that did not favor the claimant without incorporating Dr. Campbell's "psychological limitations pertaining to judgment and task persistence" into the RFC. (Pl.'s Mot. Summ. J. at 12–13.)

It is not clear why Plaintiff concludes that the ALJ did not incorporate portions of the opinion of limited-license psychologist Matouk and his supervisor, Dr. Campbell. The ALJ summarized the entire opinion at length (Tr. 33) and stated that "Mr. Matouk's and Dr. Campbell's opinion is given considerable weight regarding the assessment of the claimant's residual functional capacity and his ability to function in labor-related jobs within his range of aptitude" (Tr. 39). Contrary to Plaintiff's assertion, the "psychological limitations pertaining to judgment and task persistence" do appear to be incorporated into the ALJ's RFC, which provides that Barnes should be limited to "simple unskilled work with a specific vocational preparation (SVP) rating of one or two, which involves one, two, or three step instructions," "jobs that do not involve concentration on detailed or precision tasks or multi-tasking, reading, computing/calculating, or problem solving, and that require[] brief and superficial contact with the general public," and "jobs that have no production quotas mandating a specific number of pieces per hour, or with an up line or down line coworker depending on the claimant's productivity." (Tr. 36.) In fact, the RFC adopted by the ALJ was even more limited than that assessed by Dr. Lovko, who himself gave "considerable weight regarding the assessment of the clai[ma]nt's residual functional capacity" to the Matouk/Campbell opinion. (*See* Tr. 311, 315.) The ALJ's evaluation of the Matouk/Campbell opinion is supported by substantial evidence.

22

### C. Evaluation of PA Bogos's Opinion

Plaintiff argues that the ALJ erred by failing to provide an adequate explanation for assigning "limited weight" to the opinion of Melissa Bogos, a certified physician's assistant. (Pl.'s Mot. Summ. J. at 14–15.) Plaintiff also argues that PA Bogos's opinion should have been fully credited because hers "is the only opinion found in the record from any medical professional concerning Plaintiff's physical impairments," and she "has been the claimant's treating source at CBM Medical since at least November 2010." (*Id.* at 15–16.)

The Commissioner argues that because PA Bogos is not an acceptable medical source, the ALJ was not required even to assign weight to her opinion, yet he provided "a detailed discussion of Ms. Bogos statements in his decision." (Def.'s Mot. Summ. J. at 8.) The ALJ properly gave her opinion little weight, according to the Commissioner, because "the medical evidence of record did not support that Plaintiff's impairments were as extremely limited as Ms. Bogos' opinion." (*Id.*)

The opinions of physician assistants are considered "other sources" as defined in 20 C.F.R. § 416.913(d) and 20 C.F.R. § 404.1513(d). They may be used "to show the severity of [the claimant's] impairment(s) and how it affects [his] ability to work." 20 C.F.R. § 416.913(d); 20 C.F.R. § 404.1513(d). Social Security Ruling 06-03p notes that "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs," opinions from PAs and other medical personnel who are not doctors are increasingly common. SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 6, 2006). Although they are "not technically deemed 'acceptable medical sources' under [the SSA's] rules," the Ruling provides that they "are

important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* The Sixth Circuit has confirmed this: "[w]hile the ruling notes that information from 'other sources' cannot establish the existence of a medically determinable impairment, the information 'may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007).

Ruling 06-03p provides that the ALJ "generally should explain the weight given to the opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6. Factors to be considered include:

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion;
- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
- Any other factors that tend to support or refute the opinion.

*Id.* at *4–5. The Ruling states that "[t]he fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source,'" but "depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the

24

opinion of an 'acceptable medical source,' including the medical opinion of a treating source." *Id.* at \*5. For example, the non-acceptable medical source's opinion may be given more weight "if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." *Id.*

In *Cruse*, the ALJ's only explanation for discounting the opinion of a nurse practitioner who evaluated the claimant was that she was "neither a medical doctor nor a vocational expert, and thus lacks the credentials for making such a determination." 502 F.3d at 541. The Sixth Circuit found that "[f]ollowing SSR 06–03p, the ALJ should have discussed the factors relating to his treatment of [the claimant's] assessment, so as to have provided some basis for why he was rejecting the opinion." *Id.* The court did not remand the case, however, because it found that SSR 06–03p was not implemented until after the SSA's decision in the case became final. *Id.*

Ruling 06-03p does apply in this case, and the reasoning of *Cruse* indicates that the ALJ failed to comply with it here. The only reason given by the ALJ for assigning limited weight to PA Bogos's opinion was that she was "not considered an acceptable medical source." (Tr. 39.) As in *Cruse*, this is not a sufficient explanation. ALJ Blair did not address any of the factors that should have been weighed in evaluating PA Bogos's opinion, such as her history of treating Barnes, her expertise, and the consistency of her opinion with the rest of the record. *See* SSR 06–03p, 2006 WL 2329939, at \*4–5. In fact, there is no other opinion on Barnes's physical impairments in the record on which the ALJ could rely to cast doubt on PA Bogos's opinion. Accordingly, the ALJ's decision to give PA Bogos's opinion limited weight is not supported by substantial evidence. The decision should be remanded for a proper evaluation.

25

### D. CPP Limitations

Plaintiff argues that the ALJ erred by "fail[ing] to incorporate his own finding of 'moderate limitations in concentration, persistence, and pace' into his hypothetical questions to the VE." (Pl.'s Mot. Summ. J. at 16–17.) The Commissioner argues that "the ALJ found numerous mental limitations and incorporated them in the hypothetical question to the vocational expert," including a limitation to unskilled simple work involving no more than three-step tasks, and therefore the RFC was consistent with the ALJ's finding that Plaintiff had moderate difficulty in maintaining concentration, persistence, or pace. (Def.'s Mot. Summ. J. at 10–11.) The Court agrees with the Commissioner that the ALJ's RFC and corresponding hypothetical question to the VE adequately account for his finding of moderate limitations in concentration, persistence, and pace ("CPP").

The ultimate question is whether substantial evidence supports the ALJ's choice of limitations in the RFC assessment and corresponding hypothetical; the ALJ need not include "talismanic language" in his hypothetical whenever he finds the claimant has CPP limitations. *See Smith v. Halter*, 307 F.3d 377, 378–79 (6th Cir. 2001). Although some cases have suggested that an RFC limiting a claimant to "unskilled" or "simple, routine" work is not sufficient to account for "moderate" limitations in CPP because the claimant may have difficulty staying on task or keeping pace even when performing unskilled or simple, routine work, other decisions have recognized that limiting a claimant to unskilled or simple, routine work is sufficient because at least some claimants with those limitations can stay on task and keep pace when the work is simple. *See White v. Comm'r of Soc. Sec.,* No. 12-12833, 2013 WL 4414727 (E.D. Mich.

Aug. 14, 2013) (discussing case law). But here, the ALJ went far beyond a limitation to "simple, routine" or "unskilled" work. He expressly excluded "jobs that involve concentration on detailed or precision tasks or multi-tasking, reading, computing/calculating, or problem solving," as well as jobs with production quotas or keeping pace with a coworker. Moreover, the ALJ relied on the Matouk/Campbell opinion, which indicated that Barnes "appear[ed] functional for labor-related jobs within his range of aptitude." (Tr. 297; *see* Tr. 39.)

The ALJ's incorporation of his finding that Barnes had moderate CPP limitations into the RFC and hypothetical question to the VE is supported by substantial evidence.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, the Court finds that the Administrative Law Judge erred in failing to rely on the opinion of a medical expert on the issue of equivalence and in assigning limited weight to the opinion of a physician assistant who treated Barnes. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 10) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 12) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED to properly address the medical equivalence issue and to properly evaluate the opinion of the physician assistant.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of

appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596–97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).


Date: November 18, 2013                                                    s/Laurie J. Michelson_____
                                                                           Laurie J. Michelson
                                                                           United States Magistrate Judge




                                   CERTIFICATE OF SERVICE

        The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on November 18, 2013.


                                             s/Jane Johnson
                                             Deputy Clerk